

**JASON R. SMITH**
**Business Development Analyst/Assistant**

August 14, 2009

Norman Hauser
Cape Fear Bulk LLC
dba Metro Ports
336 Shipyard Blvd.
Wilmington, NC 28412

Dear Mr. Hauser,

We have received your letter of intent to renew the lease agreement between Cape Fear Bulk LLC and the North Carolina State Ports Authority for the lease of the C-1 Warehouse and property at the Port of Wilmington for an additional five-year term.

We are pleased that you have decided to extend your Agreement, and we look forward to continuing to work with you over the coming years.

Best Regards,

Jason R. Smith

Ex. A

P.O. Box 9002  Wilmington, NC 28402
Phone: 910-343-6227  Fax: 910-763-6440
Jason_Smith@ncports.com
Case 7:22-cv-00067-FL    Document 1-1    Filed 04/26/22    Page 1 of 53



**METRO PORTS**

EXCELLENCE SINCE 1923

June 25, 2009

North Carolina State Ports Authority
Post Office Box 9002
Wilmington, North Carolina 28403
Attention: Ed Church, Property Administrator

Subject:  Renewal of C-1 Warehouse and property lease

Dear Mr. Church:

With this letter, Cape Fear Bulk LLC hereby provides notice that it is exercising its option to renew the lease on the C-1 warehouse and associated property as required by Section 3.2 of the Agreement dated January 1, 2005 for an additional five (5) year term.

We appreciate this opportunity to continue our business relationship with the Port, and look forward to continuing to strengthen our partnership.

Best Regards,

Norman Hauser
on behalf of Nautilus Management Services, Inc., Manager of Cape Fear Bulk LLC

CAPE FEAR BULK LLC dba METRO PORTS
336 SHIPYARD BLVD • WILMINGTON, NORTH CAROLINA 28412
PHONE 310.816.0545 • FAX 910.798.6188 • WWW.METPORTS.COM

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

LEASE

BETWEEN CAPE FEAR BULK, LLC AND NORTH
CAROLINA STATE PORTS AUTHORITY

THIS LEASE dated as of January 1, 2005 by and between the NORTH CAROLINA STATE PORTS AUTHORITY, an agency of the State of North Carolina created and operating pursuant to Part 10 of Article 10 of Chapter 143B of the General Statutes of North Carolina ("NCSPA"), and CAPE FEAR BULK, LLC, a North Carolina limited liability corporation ("CFB");

W I T N E S S E T H:

WHEREAS, NCSPA owns and operates an ocean port terminal at Wilmington, North Carolina (Wilmington Port); and

WHEREAS, NCSPA and CFB desire to enter into an agreement with respect to the leasing of certain premises situated within Wilmington Port and the operation and maintenance of certain equipment and facilities presently located thereon.

NOW, THEREFORE, in consideration of the premises and of the agreements and covenants herein contained, and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

**ARTICLE 1.  DEFINITIONS**

1.1  Terms Defined in this Section.  The following terms as used in this Lease shall have the respective meanings set forth below:

(a) Bulk Gate -- the entrance to Wilmington Port that is situated on the northern end of Wilmington Port, on Burnett Boulevard, or as said gate may be relocated from time to time.

(b) Director of Operations -- Operations Director of the Port of Wilmington, as designated from time to time by NCSPA.

(c) Environmental Law -- all current and future rules, regulations, orders, judgments, decrees, ordinances, acts, permits, licenses, laws, codes, legislation or statutes of all local, municipal, county, state and federal authorities applicable to the discharge of any hazardous materials as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended by the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act of 1976 as amended by the Solid Waste Disposal Act, the Hazardous Materials Transportation Act of 1976 as amended, the Toxic Substance Control Act of 1976 as amended, the Clean Water Act and the Clean Air Act.

(d) Force Majeure -- any event or occurrence of any nature or kind beyond the control of and occurring without the negligence of the party invoking the same, including without limitation: acts of God or of the public enemy, acts of any government or governmental authority (other than NCSPA) in either its sovereign or its contractual capacity, governmental restrictions or controls on foreign exchange, wars, riots, fires, floods, storms, explosions, epidemics, or quarantine restrictions, boycotts, blackouts, strikes, labor disputes, freight embargoes, or other causes of similar nature. Force Majeure shall also include a termination of this Lease prior to the end of the initial Lease Term unless the Lease is terminated by NCSPA is the result of a material default of CFB hereunder.

(e) Leased Area -- that parcel of land and the building together with all present and future improvements thereon and all present and future expansions of and additions to said improvements, located within Wilmington Port, consisting of; 262,000 square feet, more or less, in building C-1, as described more fully in Exhibit A which is attached hereto and made a part hereof.

(f) Moveable Equipment -- tangible personal property, excluding fixtures but including: self-propelled machines, conveyors, stackers, car moving systems, and any and all machinery used or operated in connection with the foregoing.

Permanent Improvements -- improvements situated upon the Leased Area together with all fixtures situated in or on or attached to such improvements.

(g) Producers Price Index (PPI) – The Producers Price Index, (All Commodities) as reflected in the report published by the U.S. Department of Commerce, or a comparable statistic computed and published by an agency of the United States should the publication of the PPI be discontinued.

(h) Product -- as used herein, the term Product shall mean any dry bulk commodity Shipped by CFB including agricultural and industrial products, for which all necessary permits (including Air Quality Permits, as applicable) have been granted by the appropriate regulatory agencies.

(i) Shipped -- moved through Wilmington Port to or from the holds of vessels. The term "Shipped" shall not apply to transit cargo (stored at Wilmington Port without a prior or subsequent movement at the Port via water). Transit cargo shall be subject to Tariff Rate.

(j) Switching -- the movement of rail cars from the time such cars leave the main line of the CSX at Wilmington Port until such cars are returned to such main line, but excluding the movement of such cars by means of a car puller or other similar device.

(k) Tariff Rate -- the rate stated in the Morehead City and Wilmington Terminal Tariff No. 7 and as said Tariff may be changed from time to time in the sole discretion of NCSPA.

(l) Ton -- a short ton of 2,000 pounds. (For purposes of conversion, a metric ton shall be deemed to equal 1.1023 Tons.)

1.2 <u>Terms Defined Elsewhere in this Lease.</u>

The following terms as used in this Lease are defined in the respective sections of this Lease referred to below:

| | | |
|---|---|---|
| (a) Lease | P. 1 |
| (b) Lease Term | § 3.1 |
| (c) Annual Rent | § 5.1 |
| (d) CFB | P. 1 |
| (e) NCSPA | P. 1 |

|     |                  |        |
| --- | ---------------- | ------ |
| (f) | Release          | §16.1  |
| (g) | Renewal Term     | § 3.2  |
| (h) | Term Year        | § 3.1  |
| (i) | Wharfage Charge  | § 5.2  |
| (j) | Wilmington Port  | P. 1   |

## ARTICLE 2.  LEASE OF LEASED AREA; QUIET ENJOYMENT

2.1 <u>Lease of Leased Area</u>.  NCSPA, as Lessor, hereby leases to CFB, as Lessee, the Leased Area for the Lease Term as provided in Section 3.1, subject to the terms and provisions hereof.  CFB takes and leases the Leased Area "as is" understanding that NCSPA does not intend to expend substantial funds in any extensive repair or renovation of the building.

2.2 <u>Quiet Enjoyment</u>. NCSPA, for itself, its successors and its assigns, covenants and agrees with CFB, its successors and assigns, that (a) NCSPA has and shall have at all times the right to lease the Leased Area during the Lease Term as provided herein, (b) NCSPA shall defend the right of CFB to occupy and use the Leased Area against all persons whomsoever, (c) contingent upon the due performance and observance by CFB of all its covenants and agreements provided herein, CFB shall peacefully and quietly hold and enjoy the Leased Area and all rights appurtenant thereto, subject to the terms and provisions hereof, and shall be entitled to and shall have exclusive possession of the Leased Area and (d) NCSPA has the right to and shall control all activities conducted upon the property adjacent to or in the vicinity of the Leased Area so that such activities shall not interfere with the quiet enjoyment of the Leased Area by CFB.

2.3 <u>Access</u>.

(a)  NCSPA hereby grants to CFB at all times during the Lease Term, full rights of access to the Leased Area from the adjoining streets, land and railroad facilities of NCSPA's Wilmington Port provided that CFB and its employees, servants, licensees, invitees and agents shall be required to use the Bulk Gate.  Provided further that whenever the use of the Bulk Gate shall not be practicable, CFB

and all such persons shall be entitled to use the South Gate upon coordination with the Director of Operations.

(b) Upon request by the Director of Operations to CFB, NCSPA shall have reasonable rights of access to and the right to make reasonable inspections of the Leased Area as the Director of Operations shall deem necessary in order to satisfy NCSPA of CFB's compliance with the terms of this Lease. Such inspections shall be made in such a manner and at such times as shall not interrupt the operations of CFB.

2.4    Use of Leased Area.  CFB shall use the Leased Area solely for the purpose of the receipt, storage and delivery of Product, as defined herein, including but not limited to bagging, screening and other customer driven activities.

2.5    Utilities.

(a)    All utility connections, including any construction required relating to such connections, shall be for the account of CFB.

(b)    NCSPA hereby grants to CFB the right to make connections with existing electric, water, sewer and other utilities, to repair and renovate such existing utilities, and to undertake construction of new facilities, to the extent that CFB shall deem any of the foregoing to be necessary in connection with its operations and activities.  NCSPA shall cooperate with the reasonable requirements of the relevant public utility companies to facilitate the making of such connections, repairs and renovations and the undertaking of such construction.  CFB shall pay the reasonable costs of all such connections, repairs, renovations and construction, and will be responsible for the costs of all utility services provided to the Leased Area, including, but not limited to sewer, water, electricity, telephone service, and garbage disposal.  In the event separate metering is not possible at any of the Leased Area the parties will agree on a reasonable utility payment calculated to reimburse NCSPA for such expense.

(c)     CFB assumes complete responsibility and liability for any damage to the existing utilities located over, under and upon the Leased Area to the extent such damage results from the actions of CFB. CFB agrees promptly to replace and repair any such damage. In the event that it has not done so within a reasonable time NCSPA may, thirty (30) days after giving notice to CFB that such replacements or repairs would be provided by NCSPA if not completed by CFB, replace or repair any such damaged utilities and CFB will promptly reimburse NCSPA for the full cost thereof, including any "in-house" labor costs. Provided that: in the event the damage in question affects or impedes the operations of NCSPA or other tenants, NCSPA may effect such immediate repairs as it deems reasonably necessary to allow it to continue to conduct normal operations and CFB will reimburse NCSPA for the cost thereof.

2.6     Responsibilities of NCSPA.

(a)     NCSPA shall exert its good faith best efforts to provide cranes and hoppers in good working condition and the persons necessary to operate the cranes to serve the needs of CFB with a minimum of interruption or delay. This responsibility shall include insuring that truck hoppers, their component parts, and the gantry crane(s) necessary for the operation of the same shall be properly maintained and the component parts thereof replaced as necessary.

(b)     NCSPA will install doors and locks at the warehouse to protect and secure the facility against unauthorized access, which doors and locks shall be subject to CFB's reasonable approval. NCSPA will maintain the railroad tracks and roads at the Leased Area in good order, according to generally accepted standards and practices. NCSPA will repair the grading and drainage of the Leased Area to prevent flooding of the buildings and storage areas. Provided, that NCSPA will not be liable for any cargo damage caused by the elements or otherwise, except as may result from the active negligence of NCSPA. In the event NCSPA shall fail or refuse to properly maintain the railroad tracks, grading and drainage in keeping with the above standards, CFB may carry out such

maintenance which, in its reasonable judgment, and in keeping with the above standards, is required for the proper maintenance thereof. The reasonable cost of any such maintenance or repairs performed by CFB may be deducted from any amounts otherwise due NCSPA pursuant to this Lease.

2.7     Responsibilities of CFB.     CFB will maintain building C-1 in good order, according to generally accepted standards and practices applicable to dry bulk handling and distribution operations, normal wear and tear excepted; provided that CFB shall have no responsibility for maintenance of the roof, other structural items or the railroad tracks or roads at the Leased Area. After reasonable notice, NCSPA may conduct periodic inspections of said buildings and recommend maintenance or repairs. In the event CFB shall fail or refuse to properly maintain the buildings in keeping with the above standards, NCSPA may carry out such maintenance that, in its reasonable judgment, and in keeping with the above standards, is required for the proper maintenance thereof. The cost of any such maintenance or repairs performed by NCSPA shall be reimbursed by CFB provided, however, that NCSPA shall be responsible for the full cost of repairs or replacements that are required as a result of the negligent, reckless or willful acts or omissions of NCSPA, its employees or agents.

2.8     Use of Scale House and Scales.     CFB will have exclusive access to and use of the scale house currently occupied by CFB, and the adjacent truck scales, at the monthly charge stated in § 5.3. CFB will be responsible for the cost of scale certifications. CFB will perform routine maintenance on the scales and scale house, but major repairs to the scales will be the responsibility of NCSPA. The cost to CFB for scale inspections, certification and maintenance shall not exceed $1,000 per Term Year. Trucks requiring weighing (other than in connection with CFB Product) shall be weighed by CFB at a cost not to exceed the NCSPA Tariff Rate. CFB shall be responsible for any billing required. CFB will provide occasional weighs for NCSPA without charge.

### ARTICLE 3.  TERM OF LEASE

3.1  <u>Term</u>.  The term of this Lease ("Lease Term") shall commence on January 1, 2005 (the "Effective Date") and shall continue for a period of five years, unless extended as provided herein. Each subsequent period of twelve months beginning on January 1 shall constitute a "Term Year."

3.2  <u>Renewal of Lease</u>.  By written notice delivered to NCSPA at least one hundred twenty (120) days prior to the expiration of the Lease Term in effect at the time the notice is given, CFB shall have the option to extend this Lease for two additional term(s) of five years (each, a "Renewal Term"), upon the same terms and conditions as provided herein or as may be modified by mutual agreement. Any extension period shall then become part of the Lease Term.

3.3  <u>Termination Right.</u>  Notwithstanding the foregoing, after the initial five-year term either party shall have the right to terminate this lease upon one year's notice to the other.  NCSPA may not give this notice until the expiration of the initial term.

### ARTICLE 4.  REPRESENTATIONS AND WARRANTIES

4.1  <u>Representations and Warranties of NCSPA</u>. NCSPA represents and warrants to CFB, which representations and warranties shall survive the execution and delivery of this Lease, that the execution, delivery and performance of this Lease have been duly and validly authorized and approved by the Board of NCSPA on November 30 2004 and by the Governor and Council of State of North Carolina at a regular meeting held on December 7 2004 and will not result in a breach of, constitute a default under or violate the terms of NCSPA's organizational document or by-laws, or any law, rule, regulation, or agreement to which NCSPA is a party or by which it may be bound.  NCSPA represents and warrants that it has received all approvals of governmental authorities [including licenses, environmental permits and other permits (collectively, the "Permits")] required in connection with the ownership of the Facilities and the operation thereof by CFB, and that all Permits are valid and in effect and NCSPA is in compliance therewith.

4.2. <u>Representations and Warranties of CFB</u>. CFB represents and warrants to NCSPA that the execution of this Lease was duly approved under the terms of the limited liability company operating agreement of CFB and that no state of facts exists which would prevent CFB from legally fulfilling its obligations under this Lease.

### ARTICLE 5. <u>PAYMENTS BY CFB TO NCSPA</u>

5.1   <u>Annual Rent</u>.

(a)   For the Initial Term, annual rent shall be  $1.80 per square foot for 262,000 square feet, more or less, in building C-1 for a total annual rental of $471,600 ("Annual Rent") payable in monthly installments of $39,300.

(b)   For the first Renewal Term Annual Rent will be adjusted upward from $1.80 in the same percentage as the increase in the PPI from October 2004 to October 2009.

(c)   For the second Renewal Term Annual Rent will be adjusted upward from $1.80 in the same percentage as the increase in the PPI from October 2004 to October 2014.

(d)   If and to the extent that the Leased Area or any portion thereof, shall become unavailable to CFB or inoperable due to Force Majeure or any other cause not within the control of CFB, the amount of the Annual Rent shall be proportionately abated and CFB shall be relieved of the Wharfage Charge Guarantee in proportion to the duration and severity of the loss of use.

5.2   <u>Wharfage Charge</u>.

(a)   Wharfage Charge for CFB Product shall be at the Tariff Rate.  Provided, however, that the Tariff Rate shall not be increased more than six percent in any Term Year.

(b)(1)   CFB will guarantee payment of Wharfage Charge on 70,000 tons of Product Shipped for storage in Warehouse C-1 and on a total of 100,000 tons of Product Shipped during each Term Year.  For the purpose of satisfying the 30,000 tons requirement for Product not required to be stored in C-1, CFB will be given credit for any Product which it handles across the NCSPA docks, regardless

of where stored and regardless of who pays the Wharfage Charge. Accounting for this guarantee will occur at the end of each Term Year. Any shortfall will be paid within 30 days of receipt of the shortfall accounting. The rate for annual shortfall payments will be the Tariff Rate in effect at the beginning of such year. For example, if CFB should ship 65,000 tons for C-1, and handle 55,000 tons to outside storage, it would pay the wharfage charge on 5,000 tons (C-1 shortfall). If it handled 80,000 tons to C-1 and 15,000 tons to outside storage it would pay the wharfage charge on 5,000 tons (Overall shortfall). If it handled 75,000 tons to C-1 and 25,000 tons to outside storage there would be no shortfall. Notwithstanding the foregoing, if NCSPA should reduce the amount of property available for the storage of salt (which is currently 3.35 acres), the guarantee as to the 30,000 tons requirement for Product not required to be stored in C-1 shall be reduced proportionately. For example, if NCSPA should determine it had only 2.5 acres available for salt storage (a 26% reduction) then the wharfage guarantee would be 92,200 tons [70,000 + 30,000 – (0.26 x 30,000)]. Any reduction in the guarantee will be applied pro rata as of the date salt would have been shipped through Wilmington but for the unavailability of storage space.

(b)(2) End-of–Term Adjustment—If, at the end of any five year Term CFB shall have Shipped at least 350,000 tons of Product for storage in Warehouse C-1 and at least 500,000 tons overall, and if during that Term CFB shall have been required to make any shortfall payments pursuant to section 5.2 (b)(1) above, then at the end of such five year Term CFB shall be entitled to a refund of any such shortfall payments. The refund shall be made by crediting the amount of such shortfall payment to future installments of Rent until all of such payment(s) have been refunded or, if the Lease has been terminated, by immediate refund in full.

5.3     <u>Scales</u>. CFB will pay $1,500 per month for the use of the NCSPA scales, regardless of the number of weighs. This amount will be increased when, and in the same percentage as, Annual Rent is increased pursuant to § 5.1, above.

5.4    Dockage.  Vessels carrying Product for CFB customers will be billed for dockage at the Tariff Rate.  In its discretion, NCSPA may require such vessels to pay in advance or otherwise secure payment of dockage.

5.5    Other Services.   NCSPA will provide CFB with any additional services in connection with its operations, from time to time and as reasonably requested by CFB, at its Tariff Rate.

5.6    Invoices.

(a)    Annual Rent and Scales.  Upon the first day of each calendar month during the Lease Term, NCSPA shall submit to CFB an invoice for the installment of Annual Rent and Scales with respect to such month, and CFB shall pay to NCSPA the amount of such invoice within thirty days.

(b)    Other Charges.  As soon as practicable following any CFB vessel call NCSPA shall submit to CFB an invoice with supporting documentation with respect to Wharfage Charges, Crane and Hopper Rental and Terminal Usage Fees, if applicable, which invoice shall itemize the respective amounts thereof.  CFB shall pay such invoice, except to the extent of any amount that it shall dispute, within thirty (30) days following its receipt by CFB.  In the event of a dispute with respect to an invoice that cannot be resolved within such thirty-day period, CFB shall submit a statement in writing to NCSPA setting forth (i) the amount of such invoice that is disputed, and (ii) the position of CFB with respect to such amount.  NCSPA and CFB shall then negotiate in good faith in order to resolve such dispute, but CFB will not be entitled to withhold payment of any amount not actually in dispute.

## ARTICLE 6.  BOOKS AND RECORDS

Each party shall have the right at reasonable times and in a reasonable manner to inspect the books and records of the other party only to the extent necessary to ensure that the accounts of such other party with respect to amount of Product Shipped and any specific information about the Products are complete and accurate.  The party making such an inspection shall hold in complete confidence all information obtained therefrom, except as shall be necessary to settle any dispute between the parties.

**ARTICLE 7. OPERATIONS**

7.1 <u>Responsibilities of NCSPA</u>.

(a)   NCSPA shall use best efforts to ensure that cranes and hoppers and the persons necessary to operate the cranes will be available to serve the needs of CFB with a minimum of interruption or delay.  Provided that, the foregoing should not be construed as affording CFB priority rights to the assignment of equipment.

(b)   NCSPA shall use its best efforts (i) to coordinate with the United States Army Corps of Engineers in order to maintain a channel to its docks, and (ii) to coordinate the NCSPA dredging program with the channel dredging program so as to maintain a minimum sailing draft of 38 feet in said channel and berths.

(c)   NCSPA will comply with the terms of any law, regulation or permit (including the Permits) applicable to its ownership of  the Leased Area and operation of the Wilmington Port.

7.2 <u>Responsibilities of CFB</u>.

(a)   The operations conducted on the Leased Area by CFB shall be entirely the responsibility of CFB, to include labor, maintenance, utilities, administrative services and any other costs connected with CFB's operations.  CFB will comply with the terms of any law, regulation or permit applicable to its operations or the construction of any improvements on the Leased Area.

(b)   <u>Certain Repairs and Replacements</u>.

NCSPA shall be solely responsible for the full cost of repairs or replacements in the Leased Area that consist of the railroad tracks, roads, grading and drainage or repairs or replacements that are required as a result of the negligent, reckless or willful acts or omissions of NCSPA, its employees or agents or repairs or replacements that are covered by the insurance required to be carried by NCSPA pursuant to Section 10.1(b) below.  In the event NCSPA fails to perform its obligations hereunder, CFB shall have the right to perform such services and offset rent due under the Lease by an amount

equal to CFB's reasonable costs of such performance. CFB shall be responsible for any other repairs, replacements or maintenance required to maintain the Leased Area in good order and repair, subject to reasonable wear and tear and to Force Majeure.

7.3    <u>Railroad Car Switching; Track and Road Maintenance</u>. NCSPA shall not have any responsibility or liability with respect to Switching in connection with CFB's operations. Any and all arrangements that CFB may make with respect to Switching are acknowledged to be outside the scope of this Lease. NCSPA shall be solely responsible for maintaining the existing railroad tracks and roads on the Leased Area and to and from the Facilities.

7.4    <u>Congestion</u>. CFB will use commercially reasonable efforts to provide an adequate number of trucks to enable the NCSPA to efficiently discharge vessels, and NCSPA will endeavor to conduct its operations so as not to interfere with those of CFB.

### ARTICLE 8.  <u>OWNERSHIP OF PROPERTY</u>

8.1    <u>Permanent Improvements</u>. Subject to the provisions of Article 9, CFB shall have the right to add to the Permanent Improvements now situated upon the Leased Area. Upon the expiration or termination of this Lease, however effected, NCSPA shall become the sole owner of such Permanent Improvements

8.2    <u>Moveable Equipment</u>. CFB is the sole owner of all Moveable Equipment situated upon the Leased Area. Upon expiration of the Lease Term or in the event of the termination of the Lease by either party for any reason, CFB shall use commercially reasonable efforts to remove such Moveable Equipment from the Leased Area within thirty days following such expiration or termination. NCSPA shall become the sole owner of all such Moveable Equipment remaining upon the Leased Area thirty days following such termination or expiration. NCSPA will exert its good faith best efforts to provide a storage or "lay down" area for such Moveable Equipment as cannot be removed from Wilmington Port within the 30 day period, at its usual rental rates.

## ARTICLE 9. __ADDITIONS TO LEASED AREA AND RELATED FACILITIES__

9.1 __Leased Area__. CFB shall be entitled to make such changes in and additions to the Leased Area as it shall reasonably deem necessary or appropriate in connection with its operations, provided that before making any such change, addition or expansion CFB shall furnish a copy of the plans to the Director of Engineering and Planning of NCSPA for approval, which approval will not be unreasonably withheld. Any changes, alterations or additions made by CFB pursuant to this Article shall be done in a good and workmanlike manner, and in compliance with all applicable laws, ordinances, orders and requirements of all federal, state and local authorities having jurisdiction. CFB agrees that it will promptly remove or release, by the posting of a bond or otherwise, any lien attached to or upon the Leased Area or any portion thereof as a result of any such changes, alterations or additions made by CFB.

9.2 __Other Improvements and Arrangements__. In the event that CFB shall determine the railroad tracks and spurs and the general storage area available for the moving and storage of rail cars are insufficient for the efficient operation of the Leased Area, NCSPA shall cooperate with CFB in permitting the construction of such additional improvements or the making of such arrangements by CFB as shall be necessary for the efficient operation of the Facilities. NCSPA shall not be required under this Section to make any specific property available to CFB or to materially interrupt or impede any other operations of NCSPA.

## ARTICLE 10. __INSURANCE: LIABILITY__

10.1 __Insurance__.

(a) During the Lease Term, CFB shall maintain in force at all times (i) commercial general liability insurance insuring CFB against loss, damage, or liability for injury to or death of persons and loss of or damage to property resulting from its activities on the Wilmington Port, including damages caused by the operation of machinery, self-propelled or otherwise, with limits of not less than

$1,500,000 per occurrence; (ii) worker's compensation insurance in such amounts as shall be required by law, and such other forms and amounts of insurance as may from time to time be reasonably requested by NCSPA or as may be required by law. Each of such policies shall contain cancellation provisions requiring not less than thirty days' prior written notice to NCSPA as a condition precedent to any cancellation thereof. Upon the request of NCSPA, CFB shall produce evidence of any and all such insurance reasonably satisfactory to NCSPA.

(b)   NCSPA shall maintain in force at all times, with financially sound and responsible insurance carriers, fire, all-risk and extended coverage insurance on building C-1 in the amount of the replacement value thereof. Upon the request of CFB, NCSPA shall produce evidence of such insurance reasonably satisfactory to CFB.

(c)   The insurance required under Section 10.1(a)(i) shall name NCSPA as an additional insured as its interest may appear.

(d)   To the full extent permitted by law, NCSPA and CFB each waives all right to recovery against the other for, and agrees to release the other from liability for, loss or damage to the extent such loss or damage is covered by valid and collectible insurance in effect at the time of such loss or damage or would be covered by the insurance required to be maintained under this Lease by the party seeking recovery.

10.2    Liability.

10.2.1. CFB shall at all times relieve, indemnify, protect and save harmless NCSPA and any and all of its officers, agents and employees from any and all claims and demands, actions, proceedings, losses, liens, costs and judgments of any kind and nature whatsoever, including expenses incurred in defending against legal actions, for death or of injury to persons, or damage to property, including property owned by or under the care and custody of NCSPA and for civil fines and penalties that may arise from or be caused directly or indirectly by:

(a) Any dangerous, hazardous, unsafe or defective condition of, in or on the Leased Area, of any nature whatsoever, which may exist by reason of any act, omission, neglect, or any use or occupation of the Leased Area by CFB, its officers, agents, employees, sublessees, licensees or invitees;

(b) Any operation conducted upon or any use or occupation of the Leased Area by CFB, its officers, agents, employees, sublessees, licensees or invitees under or pursuant to the provisions of this Lease or otherwise;

(c) Any negligence or willful misconduct of CFB, its officers, agents, employees, sublessees, licensees or invitees; or

(d) Any failure of CFB, its officers, agents or employees to comply with any of the terms or conditions of this Lease or any applicable federal, state, regional, or municipal law, ordinance, rule or regulation.

10.2.2 The term "persons" as used in Subsection 10.2.1 shall include, but not be limited to, officers and employees of CFB.

10.2.3. CFB shall also indemnify, defend and hold NCSPA harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, diminution of the value of the premises, damages for loss or restriction on use of rentable or useable space or of any amenity of the Leased Area, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees) which arise during or after the Lease Term as a result of contamination during the Lease Term of the Leased Area by hazardous materials in violation of any Environmental Law or by hazardous materials requiring clean up or remediation under applicable Environmental Law, but only, in each instance, if CFB is responsible for such contamination. This indemnification of NCSPA by CFB includes, without limitation, costs incurred in connection with any investigation of site conditions or any clean up,

remedial, removal or restoration work required by any federal, state or local governmental agency because of hazardous material present in the soil or groundwater on or under the Leased Area for which CFB was responsible, but shall not include the migration of any such hazardous material from any adjacent site during the Lease Term. The foregoing indemnity shall survive the expiration or earlier termination of this Lease.

10.2.4. CFB shall not be liable for, and NCSPA shall, to the extent permitted by law and not inconsistent with the North Carolina Tort Claims Act, relieve, indemnify, protect and save harmless CFB and any and all of its officers, agents and employees from any and all claims and demands, actions, proceedings, losses, liens, costs and judgments of any kind and nature whatsoever, including expenses incurred in defending against legal actions, for death or injury to persons, or damage to property, including property owned by or under the care and custody of CFB and for civil fines and penalties that may arise from or be caused directly or indirectly by:

(a) Any dangerous, hazardous, unsafe or defective condition of, in or on the Leased Area, of any nature whatsoever, except for conditions of which CFB was or should have been aware prior to the damage or injury in question;

(b) Any contamination of the Leased Area prior to the Effective Date by hazardous materials in violation of any Environmental Law or requiring clean up or remediation under applicable Environmental Law;

(c) Any negligence or willful misconduct of NCSPA, its officers, agents, employees, sublessees, licensees or invitees; or

(d) Any failure of NCSPA, its officers, agents or employees to comply with any of the terms or conditions of this Lease or any applicable federal, state, regional, or municipal law, ordinance, rule or regulation.

The term "persons" as used in this Subsection 10.2.4 shall include, but not be limited to,

officers and employees of NCSPA.

10.2.5  The indemnification of CFB by NCSPA includes, without limitation, costs incurred in connection with any investigation of site conditions or any clean up, remedial, removal or restoration work required by any federal, state or local governmental agency because of hazardous material which was present in the soil or groundwater on or under the Leased Area prior to the Effective Date.  The foregoing indemnity shall survive the expiration or earlier termination of this Lease.

## ARTICLE 11.  COMPLIANCE WITH LAW

11.1    Compliance with Law.  During the term hereof (a) CFB and NCSPA shall each obey and comply with the laws of the State of North Carolina and the United States, including all Environmental Laws, and every statute, law, rule, regulation, ordinance or order by any governmental body or agency, to the extent that any of the foregoing shall be applicable to them, (b) neither CFB nor NCSPA shall commit or permit any nuisance to be carried out or performed at Wilmington Port, and (c) NCSPA shall not promulgate or enforce any rule, regulation, ordinance or order that would be inconsistent or conflict with the terms and provisions of, prevent or hinder the performance by either party under, this Lease.  However, CFB or NCSPA may in good faith contest the validity of any statute, law, rule, regulation, ordinance or order, on the condition that such contest shall be pursued diligently.

## ARTICLE 12.  FORCE MAJEURE

12.1    Limitation of Liability.  Neither party shall be liable to the other with respect to damages on account of any delay or failure in the performance of any such party's obligations under this Lease if such delay or failure is due to Force Majeure.  With respect to any incident of Force Majeure with respect to the Leased Area or the NCSPA docks that prevents CFB from conducting its normal operations, the Wharfage Charge Guarantee set out in Section 5.2 shall be proportionately reduced based on the severity and duration of the event of Force Majeure.

12.2    Notice.  In the event that either party determines that an event of Force Majeure has occurred or is likely to occur which has delayed or prevented or is likely to delay or prevent such party's performance hereunder, such party shall promptly furnish to the other party hereto written notice of such Force Majeure, setting forth the nature of such Force Majeure, the anticipated effect thereof on such party's performance hereunder, including the expected duration, and the alternative performance proposed by such party.

12.3    Efforts to Combat Force Majeure.  The party whose performance hereunder is delayed or prevented by Force Majeure shall use commercially reasonable efforts to resume, with the least possible delay, compliance with its obligations hereunder, provided that such party shall not be required to settle any strike or industrial dispute.

## ARTICLE 13.  TAXES AND FEES

13.1    Liability of CFB.  NCSPA is an agency of the State of North Carolina and as such its property is not subject to any ad valorem taxes of Wilmington or New Hanover County, North Carolina.  In the event that any type or form of tax shall be imposed upon the leasehold interest of CFB or on the Product or any personal property in the Leased Area CFB shall be solely responsible for the payment of any and all such taxes and shall indemnify NCSPA and hold it harmless against the same; provided that NCSPA shall not pay any such taxes and that, upon receipt of any invoice therefore, NCSPA shall promptly forward such invoice to CFB.  Notwithstanding the foregoing, CFB shall not be prevented from contesting in good faith the validity of any type or form of tax.

13.2    Obligations of NCSPA.  NCSPA shall not levy any special taxes or levies upon the Leased Area or any operations or activities conducted in connection therewith.

## ARTICLE 14.  DEFAULT

14.1    Default by CFB.  Each of the following shall be deemed to be a default under this Lease:

(a) failure of CFB to pay, as provided herein, (i) Annual Rent, (ii) Wharfage Charges or (iii) other charges provided for in this Lease to the extent the same shall not be in dispute, and such failure continues for fifteen (15) days after the receipt by CFB or a written notice to CFB by NCSPA that the same shall be due and payable;

(b) default in the performance by CFB of any other covenant or agreement to be performed by it hereunder that shall continue for a period of thirty days following written notice by NCSPA to CFB specifying such default and requiring it to be remedied. Provided that, in the case of any default which with due diligence cannot be remedied by CFB within such thirty day period, if CFB shall proceed with all due diligence to remedy such default, such thirty day period shall be extended for such additional period as may be reasonably necessary.

14.2    Default by NCSPA. The following shall be deemed to be a default under this Lease:  a default in the performance by NCSPA of any covenant or agreement to be performed by it hereunder that shall continue for a period of thirty days following written notice by CFB to NCSPA specifying such default and requiring it to be remedied: Provided that, in the case of any default which with due diligence cannot be remedied by NCSPA within such thirty day period, if NCSPA shall proceed with all due diligence to remedy such default, such thirty day period shall be extended for such additional period as may be reasonably necessary.

**ARTICLE 15. <u>TERMINATION</u>**

15.1    <u>By Either Party for Damage or Destruction</u>.  In the event that any portion of the Leased Area shall be damaged or destroyed as a result of fire, flood, storm, explosion, riot, act of God or other event(s) or causes, including failure due to age and deterioration, such that the effective storage capacity of the Leased Area shall be reduced by more than twenty-five percent (25%), and such damage or destruction or failure cannot be repaired in less than 180 days, either party shall have the right to terminate this Lease upon thirty (30) days' prior written notice to the other.  During any such

period of reduced capacity, whether being repaired or not, Annual Rent and Wharfage Guarantee shall be abated in proportion to the reduction in CFB's storage capacity.

15.2    Right of NCSPA to Terminate.  In the event of any default by CFB under Section 14.1(a) or any default by it under Section 14.1(b) that shall not have been remedied as provided therein, NCSPA by written notice delivered to CFB at any time during the continuation of such default may terminate this Lease as of a date to be specified in such notice.  Said date shall be not less than thirty (30) days following the delivery of such notice and this Lease shall terminate on such specified date unless such default shall have been cured prior thereto.

15.3    Right of CFB to Terminate.  In the event of a default by NCSPA under Section 14.2 that shall not have been remedied as provided therein, CFB by written notice delivered to NCSPA at any time during the continuation of such default may terminate this Lease as of a date to be specified in such notice.  Said date shall be not less than thirty days following the delivery of such notice and this Lease shall terminate on such specified date unless such default shall have been cured prior thereto.

15.4    Obligations of CFB Upon Termination.  In the event of a termination of this Lease for any reason, including but not limited to default of CFB or NCSPA, CFB shall pay forthwith to NCSPA any and all sums due NCSPA under this Lease, including without limitation sums in respect of Annual Rent, Wharfage Charges and other charges accrued as of the date of termination.  CFB shall remove all Product stored on the Leased Area, and shall thoroughly clean the same including, in the case of buildings, removing any residues which may have settled on floors, walls, roofs and supporting structures using high pressure air and water. All storage pad surfaces must be swept clean.  CFB will properly dispose of any cleaning residue.  Subject to the provisions of Section 8.2, CFB shall also remove any Moveable Equipment, other equipment or other material from the Leased Area.  Should CFB fail to comply with this Section, NCSPA shall have the right to clean the Leased Area and

remove any Product, equipment, material or, subject to Section 8.2, Moveable Equipment at CFB's expense

15.5   Other Rights of NCSPA.  Subject to Section 8.2, in the event that this Lease shall be terminated by NCSPA as provided in Section 14.2, or (ii) in the event that the Leased Area shall be abandoned by CFB, then NCSPA, its employees, servants, representatives and/or agents shall be entitled immediately or at any time thereafter to reenter and resume possession of the Leased Area and to remove all persons and property from the Leased Area by summary ejectment proceedings, an appropriate action or proceeding at law, or reasonable force, without incurring liability to CFB for any damages in connection therewith.  Any such reentry by NCSPA upon the Leased Area shall not be deemed to be an acceptance by it of the surrender by CFB of this Lease.

**ARTICLE 16.  ENVIRONMENTAL CLAUSES**

16.1   Liability and Reporting.  CFB shall be liable for, and shall hold NCSPA harmless from, any loss, cost, or damages, including reasonable attorney's fees, due wholly or in part to CFB's failure to remediate any hazardous or polluting substance caused or allowed to be leaked, spilled, or otherwise introduced on or around the Leased Area or any other part of Wilmington Port as the result of CFB's operations thereon (a "Release"), where such Release was in violation of any Environmental Law or requires clean up or remediation under applicable Environmental Law.  CFB shall furnish NCSPA with a written report detailing all Releases, as defined in Subsection 101 (22) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA or Superfund Act), P.L. 96-510, or as defined in any applicable permit, which occur on or from the Leased Area whenever such Releases are required to be reported to any federal, state or local authority in accordance with any federal, state or local laws, rules, and ordinances, and any regulations issued thereunder.  Such written report shall identify the material released, the estimated amount released, and the measures undertaken to clean up and remove the released material and any contaminated soil or water, and shall further

certify that no contamination in excess of applicable federal, state or local cleanup requirements or standards remains or will remain after the cleanup measures have been completed. Such reports shall be supplemented by providing NCSPA with copies of any written reports required to be submitted by CFB to any governmental agency in accordance with any federal, state or local law, rule, regulation, or ordinance, or by the National Oil and Hazardous Substances Pollution Contingency Plan as it now exists or as it may hereafter be amended. The foregoing reports to NCSPA and copies of reports to governmental agencies shall be sent to NCSPA's Chief Engineer, North Carolina State Ports Authority, P. O. Box 9002, Wilmington, North Carolina 28402, at the same time as such notification, whether written or otherwise, is required to be given to any such governmental agency.

16.2 <u>Stormwater.</u> CFB will comply with all provisions and requirements of NCSPA's stormwater permit, as well as employ good housekeeping techniques to keep CFB's operations in compliance with the Stormwater Pollution Prevention Plan.

16.3 <u>Compliance.</u> CFB will conduct its operations in compliance with all environmental permits and requirements applicable thereto, including without limitation NCSPA's Air Quality Permit and any permits required for any improvements to be constructed on the Leased Area.

16.4 <u>Movement Reports</u>. Not later than the tenth of each month, so long as any of the Facilities are operated under NCSPA's Air Quality Permit, CFB will provide NCSPA's Environmental Manager with a report detailing the movement of Product from vessels and from storage to inland carrier. The report shall state the Product type as well as the amount moved.

**ARTICLE 17. <u>MISCELLANEOUS PROVISIONS</u>**

17.1 <u>Amendments.</u> This Lease may be changed only by an agreement in writing signed by both parties hereto, or, in the case of waiver, by the party waiving compliance.

17.2 <u>Entire Agreement</u>. This Lease embodies the entire agreement and understanding between the parties hereto and supersedes any prior agreements relating to the subject matter of this Lease.

17.3 <u>Counterparts</u>. This Lease may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.4 <u>Assignment</u>. This Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. In the event either party proposes to assign the Lease, it shall inform the other in writing, describing in full the proposed assignee. The other party shall then have 30 days within which to object to such assignment, but it will not do so without good cause.

17.5 <u>Governing Law/Forum for Resolution of Disputes.</u> This Lease shall be construed and interpreted in accordance with, and the rights and obligations of the parties shall be governed by, the laws of the State of North Carolina. In the event a dispute arises between the parties that cannot be settled after good faith negotiations, either party may submit the issue to mediation before a mediator certified by the US District Court or the North Carolina Superior Courts. If such mediation does not resolve the dispute, the forum for resolution shall be the Southern (Wilmington) Division of the Eastern District of the United States District Court or the North Carolina Superior Courts.

17.6 <u>Headings; Exhibits.</u>

(a) The section headings contained in this Lease are for reference purposes only and shall not affect in any way the meaning and interpretation of this Lease.

(b) All Exhibits referred to in this Lease are attached hereto and are deemed to be incorporated herein by reference.

17.7    Invalidity or Unenforceability.  In the event that any provision of this Lease shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable, this Lease shall be deemed to have been amended to eliminate such provision such that the remaining provisions of this Lease shall be valid and enforceable.

17.8    Notices.

(a)    All notices and other communications hereunder shall be in writing and shall be given or made by hand delivery, certified or registered mail, overnight delivery with proof of delivery or by facsimile as follows:

> (i)  if to NCSPA:
>
>> North Carolina State Ports Authority
>> Post Office Box 9002
>> Wilmington, North Carolina  28403
>> ATTENTION:  Property Administrator
>> COPY TO:  Chief Finance and Information Officer
>
> (ii)  if to CFB:
>
>> SQM North America Corporation
>> 3101 Towercreek Parkway
>> Suite 450
>> Atlanta, Georgia 30339
>> ATTENTION:  Mr. David Hannah

Or to such other person or address as either party hereto may specify to the other party in writing.

(b)  Any notice or other communication hereunder shall be deemed to have been duly given or made (i) when delivered against receipt therefore, (ii) if made by fax, upon acknowledgment of receipt of the transmission by the answerback of the fax machine of the receiving party, provided that a confirmation and copy of the transmittal notice is sent to such party by overnight courier. Notwithstanding the foregoing, any notice or other communication hereunder which is actually received by a party hereto shall be deemed to have been duly given or made.

17.9 <u>Waiver</u>. Any waiver by a party hereto shall be deemed to be limited in application to the matters explicitly referred to therein and shall neither be construed as, nor entitle the other party to, a waiver by such party as to any other similar matter.

17.10 <u>Damages</u>. Notwithstanding anything to the contrary elsewhere in this Lease, no party will be liable to any other party or person for incidental, consequential, special or punitive damages, loss of future revenues or income, lost profits, loss of business reputation or opportunity relating to any breach or alleged breach of this Lease, regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise.

IN WITNESS WHEREOF, the parties hereto have hereunto set their respective hands and seals as of the date first above written.

NORTH CAROLINA STATE PORTS AUTHORITY

By_____ (SEAL)
Thomas J. Eagar
Chief Executive Officer


ATTEST:

_____
Assistant Secretary


CAPE FEAR BULK, LLC
By:     SQM NORTH AMERICA CORP
        Managing Member

By_____ (SEAL)
        Ignacio Ruiz
        President

APPROVED AS TO FORM:

ROY COOPER
Attorney General

_(signature)_

Dennis Myers
Assistant Attorney General

STATE OF NORTH CAROLINA
COUNTY OF NEW HANOVER

  I, Ivy E. McGuire, a Notary Public in and for the County and State aforesaid, do hereby certify

that Jeff L. Strader personally appeared before me this date and acknowledged that he is Assistant

Secretary of the North Carolina State Ports Authority and that by authority duly given and as an act of

the North Carolina State Ports Authority, the foregoing instrument was signed by Thomas J. Eagar, its

Chief Executive Officer, attested by himself as Assistant Secretary, and sealed with the common seal

of the North Carolina State Ports Authority.

  IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this the 21 day

of January 2005.

        _(signature)_ _____ (Notary Seal)
         Notary Public

My Commission Expires:___8·17·06_____



STATE OF GEORGIA
COUNTY OF ~~BARTOW~~ COBB

I, _Obtisha Fisher_, a Notary Public in and for the County and State

aforesaid, do hereby certify that Ignacio Ruiz personally came before me this day and

acknowledged that he is the President of SQM North America Corp., which is the managing member

of CAPE FEAR BULK, LLC and that by authority duly given and as an act of SQM North America

Corp, as the managing member of CAPE FEAR BULK, LLC, the foregoing instrument was signed by

him in that capacity.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal this the 27th day

of January 2005.

_Obtisha Fisher_
Notary Public

(Notary Seal)

My Commission expires: Apr 26th 2008

Exhibit A

CARGO SHELTER No. 1

WAREHOUSE #5
PLAN

BAY 1  24,777 sq. ft.
BAY 2  24,777 sq. ft.
BAY 3  24,777 sq. ft.
BAY 4  24,777 sq. ft.
BAY 5  24,777 sq. ft.

CARGO SHELTER

7,384 sq. ft.    ROAD 20 FT.

27,607 sq. ft.
27,607 sq. ft.
27,607 sq. ft.
27,607 sq. ft.
27,607 sq. ft.

DocuSign Envelope ID: 72E20A3F-E992-4639-B1E8-919F116737CB

**STATE OF NORTH CAROLINA**
**CARTERET COUNTY**

### FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT ("Amendment") is made and effective as of the 1st day of July, 2015 ("Effective Date"), by and between the North Carolina State Ports Authority ("NCSPA"), an agency of the State of North Carolina and Southeast Crescent Shipping Company a Delaware Corporation ("SEC") authorized to do Business in the State of North Carolina (The NCSPA and SEC are referred to jointly herein as "the Parties").

### WITNESSETH:

**WHEREAS,** the NCSPA and Cape Fear Bulk LLC ("CFB") entered into a Lease Agreement ("Agreement") effective January 1, 2005 wherein CFB leased from the NCSPA the C-1 building consisting of 265,000 square feet within the Port of Wilmington, NC ("Port") for the purpose of receiving and shipping agricultural and industrial dry bulk commodities; and

**WHEREAS,** the Agreement provided CFB the exclusive access and use of the north gate scale house and adjacent scale; and

**WHEREAS,** on January 31, 2009 CFB merged with and into SEC and SEC being the surviving entity and continues to exist under the laws of Delaware; and

**WHEREAS,** the NCSPA and SEC desire to amend the Agreement pertaining to the exclusive access and use of the north gate scale house and scale;

**NOW, THEREFORE,** for good and valuable consideration, the receipt of which is hereby acknowledged, and based on the mutual covenants and conditions as contained herein and in the Agreement, the Parties agree as follows:

DocuSign Envelope ID: 72E20A3F-E992-4639-B1E8-919F116737CB

1.  The Agreement is hereby amended by deleting Section 2.8 in its entirety.

2.  The Agreement is hereby amended by deleting Section 5.3 in its entirety.

3.  The Agreement is hereby amended by deleting the words "and scales" in Section 5.6.

In all other and further respect, the Agreement will remain in full force and effect and be binding on the Parties and their approved assigns.

**IN WITNESS WHEREOF** each of the Parties hereto has caused this Amendment to be executed by its proper officer on its behalf as of the day and year first above written.

(Signatures Follow on Next Page)

First Amendment To Lease And Operating Agreement
_____, 2015
Page 2

DocuSign Envelope ID: 72E20A3F-E992-4639-B1E8-919F116737CB

**NORTH CAROLINA STATE PORTS AUTHORITY**

By: _____

      Paul J. Cozza
      Chief Executive Officer

SEAL

ATTEST:

By: _____
    Secretary

**Southeast Crescent Shipping Company,**
**successor in interest to Cape Fear Bulk LLC**

By: _____
      Michael Giove
      146442094EE04F7...

Title: _____
      COO

SEAL

ATTEST:

By: Charity Price

Title: Administrative Assistant

First Amendment To Lease And Operating Agreement
_____, 2015
Page 3

STATE OF NORTH CAROLINA

NEW HANOVER COUNTY

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT ("Amendment") is made and

effective as of the _11th_ day of _July_ 2018 ("Effective Date"), by and between

the North Carolina State Ports Authority ("NCSPA"), an agency of the State of North Carolina

and Southeast Crescent Shipping Company, a Delaware Corporation ("SEC", successor in

interest to Cape Fear Bulk, L.L.C.) authorized to do business in the State of North Carolina (The

NCSPA and SEC are hereinafter referred to jointly as "the Parties").

### WITNESSETH:

**WHEREAS**, the NCSPA and SEC desire to amend the Agreement pertaining to the

Renewal Terms and Party responsibilities, including the responsibilities for maintenance, repairs,

and replacements;

**NOW, THEREFORE**, for good and valuable consideration, the receipt of which is

hereby acknowledged, and based on the mutual covenants and conditions as contained herein and

in the Agreement, the Parties agree as follows:

## ARTICLE 2. LEASE OF LEASED AREA; QUIET ENJOYMENT

i. The Agreement is hereby amended by deleting the language in Article 2, Section

2.6(b) which states, "NCSPA will repair the grading and drainage of the Leased

Area to prevent flood of the buildings and storage areas." The deleted sentence

shall be replaced with terms that hereby states, "NCSPA shall be responsible for

maintaining the surface water and drainage system in the Leased Area, such

responsibility includes any necessary repairs and replacements of the surface

water and drainage system to prevent flooding of the building and storage areas."

1

ii.    The Agreement is hereby amended by deleting the language in Article 2, Section 2.7, which states, "CFB will maintain building C-1 in good order, according to generally accepted standards and practices applicable to dry bulk handling and distribution operations, normal wear and tear excepted; provided that CFB shall have no responsibility for maintenance of the roof, other structural items or the railroad tracks or roads at the Leased Area." The Agreement is further amended by replacing these deleted terms, with the hereby agreed upon language, which states, "SEC shall be responsible for the maintenance of building C-1, which also encompasses the roofing system. The gutters and downspouts are to be included as part of the roofing system. SEC shall maintain the building C-1, which includes said roofing system in good order, according to generally accepted standards and practices applicable to dry bulk handling and distribution operations. SEC shall not have responsibility for the maintenance and repair of the storm water drainage system, or the railroad tracks or roads at the Leased Area." However, after the date of this Amendment and until such time that the Roofing System Repairs and Replacements described in Article 7 ii below are completed, or until January 31, 2019, whichever comes first, the NCSPA will be responsible for cargo damage claims caused by water infiltration from failures in the roof.

## ARTICLE 3. TERM OF LEASE

i.    The Agreement is hereby amended by modifying, in its entirety, Article 3, Section 3.2 Renewal of Lease, to hereby state, "The parties have agreed to extend this Lease beyond the two additional term(s) of five years (each, a "Renewal Term"), for a third

2

additional term(s) of six years ("Renewal Term") up and until December 31, 2025, upon the same terms and conditions as provided in the Lease and as modified by mutual agreement in this Amendment. This extension period up and until December 31, 2025 shall become part of the Lease Term."

ii. The Agreement is hereby amended by modifying, in its entirety, Article 3, Section 3.3. Termination of Right, to hereby state, "Unless for reason of default as described in Article 14 of the Agreement or for reason of damage or destruction as described in Article 15 of the Agreement, neither party shall be allowed to terminate this lease upon one year's notice to the other until on or after January 1, 2022. On or after January 1, 2022, either party shall have the right to terminate this lease, upon providing one year's notice to the other."

**ARTICLE 5. PAYMENTS BY SEC TO NCSPA**

i. The Agreement is hereby amended by modifying Article 5, Section 5.1 (c) regarding Annual Rent to include additional terms, which hereby states, "For the Third Renewal Term, Annual Rent will be adjusted upward by three percent (3%) beginning January 1, 2020 and on each subsequent operating year anniversary thereafter.

**ARTICLE 7. OPERATIONS**

i. The Agreement is hereby amended by modifying, in its entirety, Article 7, Section 7.2(b) to hereby state, "NCSPA shall be solely responsible for the maintenance and repairs in the Leased Area that consists of the railroad tracks, roads, surface drainage, and the drainage system. Therefore, NCSPA shall also be responsible for any claims due to surface drainage and drainage system failures. NCSPA shall not be responsible for the cost of repairs or replacements in the Leased Area

3

that consists of the railroad tracks, roads, and drainage that are required as a result of the negligent, reckless, or willful acts or omissions of SEC, its employees or agents. In the event that NCSPA fails to perform its obligations hereunder, SEC shall have the right to perform such services and offset rent due under the Lease by an amount equal to SEC's reasonable costs of such performance. SEC shall be solely responsible for the maintenance and repairs, including cost of repairs or replacements that are required to maintain building C-1 in good order and repair, which includes the roofing system. Therefore, SEC shall also be responsible for any claims due to roof failure, including failure(s) that are the result of negligent repairs, failure to maintain, and the negligent, reckless or willful acts or omissions of SEC, its employees or agents. However, SEC shall not be responsible for any claims or losses due to roof failures or damage caused by an event that is covered, via a paid loss, by NCSPA's insurance policy," or for any loss, damage or claims of any kind that occur after the Term of this Lease, plus any extensions or holdovers

ii.     The Agreement is hereby amended by the addition of new terms to Article 7, Section 7.2 within an additional subsection, labeled subsection 7.2(c) Roofing System Repairs and Replacements. The Agreement is hereby amended to state, "SEC shall make agreed-upon repairs to the roof set forth in the attached Tremco Final Summary and Cost Breakdown dated May 11, 2018 to Metro Ports (attached). For purposes of this lease and roof construction, Metro Ports is a dba of SEC. Subject to the following limitation, SEC shall receive a rent credit for the actual costs of roof repairs that SEC performs. Prior to application of the rent

4

credit, the cost of roof repairs must be verified by invoices submitted to NCSPA and by inspection performed by NCSPA, Engineering Department. However, the maximum amount of rent credit for roof repairs shall not exceed $752,629.00 as detailed in the Tremco Final Summary and Cost Breakdown dated May 11, 2018 to Metro Ports (attached). The rent credit will be allocated equally over the course of the remaining years of the lease and the Third Renewal Term by reduction in monthly charges due NCSPA by SEC. SEC shall not receive rent credits for the costs of routine maintenance of the roof and/or building. In the event that NCSPA invokes an early termination of the lease, SEC shall be reimbursed for any outstanding roof repair costs that have not been credited to the annual rent. In the event that SEC invokes an early termination of the lease or defaults, SEC shall not receive any outstanding credits or payment for any outstanding roof repair costs. In the event that the roof or building is destroyed beyond reasonable repair by Force Majeure either party may terminate the lease. In such event, SEC shall be entitled to any remaining rent credits for outstanding balance of roof repair costs by payment from NCSPA. Rent credits will only be granted for the initial repairs and their costs that are completed as described in Section 7ii. In the event the initial roof repairs are less than $752,629.00, the difference between the final cost of roof repairs and $752,629.00 will not be applied to any future repairs or maintenance completed by SEC.

iii.    The Agreement is hereby amended by the addition of new terms to Article 7, Section 7.2 within an additional subsection, labeled subsection 7.2(d) Capital Improvements, other than Roof. Upon mutual agreement of the parties, SEC may

5

make capital improvements to the Leased Area, beyond roof and routine

maintenance. Prior to the capital improvements, the parties will discuss the

scope, benefits to both parties, and whether SEC will or will not receive rent

credit for cost of any capital improvements.

In all other and further respect, the Agreement will remain in full force and effect and be binding

on the Parties and their approved assigns.

**IN WITNESS WHEREOF** each of the Parties hereto has caused this Amendment to be

executed by its proper officer on its behalf as of the day and year first above written.

**(Signatures on Next Page)**

**NORTH CAROLINA STATE PORTS AUTHORITY**

By: _____

Title: _____EXECUTIVE DIRECTOR_____

ATTEST:

By: _____

**Southeast Crescent Shipping Company, successor in
interest to Cape Fear Bulk LLC**

6

By: _Michael F. Giove_

Title: _SECRETARY_

ATTEST:


By: _John L Hampton_

7


5/11/18

**Metro Ports**
348 Shipyard Blvd.
Wilmington, NC 28412

Attention: Chris Perko



**C1 Warehouse Roof Restoration Project Final Summary & Cost Breakdown**

**Summary:**

In short, we have proposed a restoration solution for the transite panel and metal roof sections identified above, that includes necessary roof detailing repairs and providing new surface coating throughout. We are confident that these products and previously provided scopes of work will provide a leak free environment for the materials stored at this facility and meet NC/Metro Ports expectations.

The asbestos containing transite panels have raised concern with mixed opinions, specifically how to clean the lichen or mold fungi from the panel to provide the proper "required" manufacture surface preparation to prompt good adhesion for new materials and carry a "Full Water Tight, 12-year Manufacture Warranty".

After cleaning a sample transite panel roof section and taking water runoff samples to be tested for asbestos as requested by NC Ports, the results were confirmed to contain high concentrations of asbestos. If washed per coating manufactures recommendations the water runoff would have to be collected and filtered into a sanitary sewer system per North Carolina and Federal regulations. I have provided a copy of the full asbestos testing report under separate cover.

Provided below is full cost summary of all the projects fixed cost and unit pricing for undeterminable items. Note that unit price items can only be approved with the full consent of the owner prior to the work being performed.

**Fixed Cost Summary:**

- **Roof Clean & Surface Preparation- $60,000.00** (40 Working Days Expected)

- **Water Collection & Filtration- $35,400.00** (The cost per day is $885.00 and this daily rate will be used to add or deduct days that will exceed or be reduced from the 40-day contract period)

- **Permeant Gutter & Down Spout Installation- $17,300.00** (Required at East Building edge to collect water for filtering, 745' total, 7" commercial grade box gutter)

- **Base Bid per Contract Specifications- $499,829.00** (Work includes safety, materials, equipment, and labor to perform detail work and roof coating as outlined in project specifications)

    **Sub Total for Project Fixed Cost: $612,529.00**

**Unit Cost Items/ Estimated Contingencies Summary:**

- **Unit Cost for Skylight Replacement- $1,500.00 EA, there is an estimated 530 individual skylight panels, contingency for 10% replacement recommended or $79,500** (Note Skylight Repair was deleted and will not be used in this project)

- **Unit Cost for Transite Panel Replacement- $1,500.00 EA, there is an estimated 5,208 panels, contingency for .5% replacement recommended or $39,000** (Panels will only be replaced if they are deemed unsafe for foot traffic or hazardous)

- **Unit Cost to Cap Exhaust Vents- $800.00 EA, there are 27 exhaust vents, contingency for 100% recommended or $21,600 turn key**

    **Sub Total for Unit Cost Items/ Estimated Contingencies: $140,100.00**

    **Total Expected Project Cost: $752,629.00**

**Warranty:**

- **Full 12 Year QA Warranty:** If the panels can be cleaned prior to detail and coating work, Tremco would offer a Standard 12 Year QA Warranty. I have provided a copy of the warranty under a separate cover.

**Tremco Value Added Services at "NO COST TO OWNER":**

- **Hold post bid meetings with contractors**
- **Provide pre-construction meeting with the owners for coordination**
- **Provide third party and manufacture on site job inspections for quality control and assurance**
- **Facilitate and engage in the project as owner consultant**
- **Provide final documentation and 12 Year QA Warranty**

We appreciate the opportunity to provide a Tremco solutions and services for C1 Warehouse. Please let me know if you have any questions or concerns.
Sincerely,

Shannon C. Miller
Tremco Building and Maintenance Division
Scmiller@tremcoinc.com , 910.367.8260

**STATE OF NORTH CAROLINA**

**NEW HANOVER COUNTY**

## THIRD AMENDMENT TO LEASE AGREEMENT

THIS THIRD AMENDMENT TO LEASE AGREEMENT ("Amendment") is made and

effective as of the ___6th___ day of ___Dec___ 2019 ("Effective Date"), by and between the North

Carolina State Ports Authority ("NCSPA"), an agency of the State of North Carolina and

Southeast Crescent Shipping Company, a Delaware Corporation ("SEC", successor in interest to

Cape Fear Bulk, L.L.C.) authorized to do business in the State of North Carolina (The NCSPA

and SEC are hereinafter referred to jointly as "the Parties").

### WITNESSETH:

**WHEREAS**, the NCSPA and SEC desire to amend the Agreement pertaining to the Party

responsibilities, including the responsibilities for maintenance, repairs, and replacements;

**NOW, THEREFORE**, for good and valuable consideration, the receipt of which is

hereby acknowledged, and based on the mutual covenants and conditions as contained herein and

in the Agreement, the Parties agree as follows:

**ARTICLE 7. <u>OPERATIONS</u>**

The Agreement is hereby amended by the addition of new terms to Article 7, Section 7.2 within

an additional subsection labeled subsection "7.2(e) Column Repairs," as follows: "7.2(e)

Column Repairs. SEC shall make agreed-upon repairs to the columns set forth in the attached

"Amendment - C1 Column Repair Plan View" dated November 25, 2019." Subject to the

following limitation, SEC shall receive a rent credit for the actual costs of column repairs and/or

A Frame repairs that SEC performs that have been mutually agreed to have been damaged by

erosion, environmental factors, or corrosion, (i) as described on Exhibit A, and also any (ii) that

1

which is later so agreed betweenChris Perko, agent for SEC, and Mark Blake, agent of NCSPA for any columns or A-frame supports that have yet to be inspected, as noted in Exhibit A of this agreement. Thirty days after identification and agreement of later column repairs between Chris Perko and Mark Blake, adjusted rent abatement will apply. Exhibit A will be regularly updated to reflect the progress of the inspection and notations on accountability for the unknown/unobserved columns, (47 unknown/unobserved columns as of November 25, 2019). Any column repairs that are due to heavy equipment damage will be performed at the cost of SEC. The rent credit will be allocated equally over the course of the remaining years of the Third Renewal Term starting on January 1, 2020. Column repairs are not considered routine maintenance. SEC shall not receive rent credits for the costs of routine maintenance of the building, except as explicitly agreed otherwise. In the event that NCSPA invokes an early termination of the lease, SEC shall be reimbursed for any outstanding column repair costs that have not already been credited to then-past annual rents. In the event that SEC invokes an early termination of the lease or defaults, SEC shall not receive any outstanding credits or payment for any outstanding column repair costs. In the event that the columns or building are destroyed beyond reasonable repair by Force Majeure, either party may terminate the lease. In such event, SEC shall be entitled to any remaining rent credits for the outstanding balance of column repair costs by payment from NCSPA. In all other and further respects, the Agreement will remain in full force and effect and be binding on the Parties and their approved assigns. Final assignment of C-1 to SEC is predicated on agreement and completion of gutter repairs, as stipulated in the Second Agreement to Lease Agreement, dated July 11, 2018.

**IN WITNESS WHEREOF** each of the Parties hereto has caused this Amendment to be executed by its proper officer on its behalf as of the day and year first above written.

**(Signatures on Next Page)**

3

**NORTH CAROLINA STATE PORTS AUTHORITY**

By: _____

Title: _____

ATTEST:

By: _____

**Southeast Crescent Shipping Company, successor in interest to Cape Fear Bulk LLC**

By: _____

Title: Presidevt      SEC _____

ATTEST:

By: _____

Proposed Metro Rent Abatement Schedule for C-1, September 4, 2019 (original), November 25, 2019 (updated)

| | RENT | RENT AFTER ABATEMENT | TOTAL ABATEMENT | Column Repair $179,704.00 | Roof Repairs, Amendment 2 $694,441.89 | Hurricane Florence and Loss of Space Rent Abatement $210,245.00 | Water Intrusion (Gutter and Rain impacts, ongoing) $20,000.00 |
|---|---|---|---|---|---|---|---|
| 10/1/2019 | $53,341.89 | $0.00 | $53,341.89 | | | $53,341.89 | |
| 11/1/2019 | $53,341.89 | $0.00 | $53,341.89 | | | $53,341.89 | |
| 12/1/2019 | $53,341.89 | $0.00 | $53,341.89 | | | $53,341.89 | |
| 1/1/2020 | $54,942.15 | $26,913.07 | $28,029.08 | $2,495.89 | $9,645.03 | $12,554.83 | $3,333.33 |
| 2/1/2020 | $54,942.15 | $26,913.07 | $28,029.08 | $2,495.89 | $9,645.03 | $12,554.83 | $3,333.33 |
| 3/1/2020 | $54,942.15 | $26,913.07 | $28,029.08 | $2,495.89 | $9,645.03 | $12,554.83 | $3,333.33 |
| 4/1/2020 | $54,942.15 | $26,913.07 | $28,029.08 | $2,495.89 | $9,645.03 | $12,554.83 | $3,333.33 |
| 5/1/2020 | $54,942.15 | $39,467.90 | $15,474.25 | $2,495.89 | $9,645.03 | | $3,333.33 |
| 6/1/2020 | $54,942.15 | $39,467.90 | $15,474.25 | $2,495.89 | $9,645.03 | | $3,333.33 |
| 7/1/2020 | $54,942.15 | $42,801.23 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 8/1/2020 | $54,942.15 | $42,801.23 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 9/1/2020 | $54,942.15 | $42,801.23 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 10/1/2020 | $54,942.15 | $42,801.23 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 11/1/2020 | $54,942.15 | $42,801.23 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 12/1/2020 | $54,942.15 | $42,801.23 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 1/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 2/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 3/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 4/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 5/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 6/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 7/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 8/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 9/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 10/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 11/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 12/1/2021 | $56,590.41 | $44,449.50 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 1/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 2/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 3/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 4/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 5/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 6/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 7/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 8/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 9/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 10/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 11/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 12/1/2022 | $58,288.12 | $46,147.21 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 1/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 2/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 3/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 4/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 5/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 6/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 7/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 8/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 9/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 10/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 11/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 12/1/2023 | $60,036.77 | $47,895.85 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 1/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 2/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 3/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 4/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 5/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 6/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 7/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 8/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 9/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 10/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 11/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 12/1/2024 | $61,837.87 | $49,696.96 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 1/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 2/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 3/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 4/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 5/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 6/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 7/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 8/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 9/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 10/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 11/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |
| 12/1/2025 | $63,693.01 | $51,552.09 | $12,140.92 | $2,495.89 | $9,645.03 | | |

| Contract | Contractor | Scope of Work | Each | Total | Contracting Entity | Notes |
|---|---|---|---|---|---|---|
| South End Column Repairs | SEI | A Frame (8X) | $22,463.00 | $179,704.00 | Metro | Firm quantity to be repaired, subject to NC Ports rent abatement |
| South End Column Repairs | SEI | Column Pedestal Repairs (15ea) | $ 2,750.00 | $ 41,250.00 | Metro | Contract cost, Subject to further additional quantity at unit price, once inspections can be made. At this time, all costs borne by Metro |
| West Wall Repairs | TMC | West Wall Repairs Project (other) | $ (2,750.00) | $ (8,250.00) | NC Ports | Includes three Column pedestals (M10/F, M11/F, M12/F), Reduces Metro's actual contract cost to SEI |

*There are some uninspected pedestals.
*Ports has a contract to repair the west wall of C-1 at a cost of $49,250 -west wall project ncludes 3 pedestals that are Metro columns M10/F, M11/F, M12/F (cost reduction to Metro)



This is identified by ACE in using, no repair needed.

These three protrusions will be part of the wall repair.

C-1 COLUMN REPAIRS

| Column | Resp. Party | Repair Type | Comments | Column | Resp. Party | Repair Type | Comments |
|---|---|---|---|---|---|---|---|
| A-N1 | N/A | N/A | Rebuilt in 2019/2020 | B-N1 | N/A | N/A | Rebuilt in 2019/2020 |
| A-N2 | N/A | N/A | Rebuilt in 2019/2020 | B-N2 | N/A | N/A | Rebuilt in 2019/2020 |
| A-N3 | N/A | N/A | Rebuilt in 2019/2020 | B-N3 | N/A | N/A | Rebuilt in 2019/2020 |
| A-N4 | N/A | N/A | Rebuilt in 2019/2020 | B-N4 | N/A | N/A | Rebuilt in 2019/2020 |
| A-N5 | N/A | N/A | Rebuilt in 2019/2020 | B-N5 | N/A | N/A | Rebuilt in 2019/2020 |
| A-N6 | N/A | N/A | Rebuilt in 2019/2020 | B-N6 | N/A | N/A | Rebuilt in 2019/2020 |
| A-N7 | N/A | N/A | Rebuilt in 2019/2020 | B-N7 | N/A | N/A | Rebuilt in 2019/2020 |
| A-M1 | N/A | N/A | Does not require repair | B-M1 | N/A | N/A | Does not require repair |
| A-M2 | N/A | N/A | Does not require repair | B-M2 | N/A | N/A | Does not require repair |
| A-M3 | N/A | N/A | Does not require repair | **B-M3** | TBD | TBD | Unobserved / Unknown |
| A-M4 | N/A | N/A | Does not require repair | **B-M4** | TBD | TBD | Unobserved / Unknown |
| A-M5 | N/A | N/A | Does not require repair | **B-M5** | TBD | TBD | Unobserved / Unknown |
| A-M6 | N/A | N/A | Does not require repair | **B-M6** | TBD | TBD | Unobserved / Unknown |
| A-M7 | N/A | N/A | Does not require repair | **B-M7** | TBD | TBD | Unobserved / Unknown |
| A-M8 | N/A | N/A | Does not require repair | **B-M8** | TBD | TBD | Unobserved / Unknown |
| A-M9 | N/A | N/A | Does not require repair | **B-M9** | TBD | TBD | Unobserved / Unknown |
| A-M10 | N/A | N/A | Does not require repair | **B-M10** | TBD | TBD | Unobserved / Unknown |
| A-M11 | N/A | N/A | Does not require repair | **B-M11** | TBD | TBD | Unobserved / Unknown |
| A-M12 | N/A | N/A | Does not require repair | **B-M12** | TBD | TBD | Unobserved / Unknown |
| A-M13 | N/A | N/A | Does not require repair | B-M13 | N/A | N/A | Does not require repair |
| A-M14 | N/A | N/A | Does not require repair | B-M14 | N/A | N/A | Does not require repair |
| A-M15 | N/A | N/A | Does not require repair | B-M15 | N/A | N/A | Does not require repair |
| A-M16 | N/A | N/A | Does not require repair | **B-M16** | TBD | TBD | Unobserved / Unknown |
| A-M17 | N/A | N/A | Does not require repair | **B-M17** | TBD | TBD | Unobserved / Unknown |
| A-M18 | N/A | N/A | Does not require repair | B-M18 | N/A | N/A | Does not require repair |
| A-M19 | N/A | N/A | Does not require repair | B-M19 | N/A | N/A | Does not require repair |
| A-M20 | N/A | N/A | Does not require repair | B-M20 | N/A | N/A | Does not require repair |
| A-M21 | N/A | N/A | Does not require repair | **B-M21** | TBD | TBD | Unobserved / Unknown |
| A-M22 | N/A | N/A | Does not require repair | **B-M22** | TBD | TBD | Unobserved / Unknown |
| A-M23 | N/A | N/A | Does not require repair | **B-M23** | TBD | TBD | Unobserved / Unknown |
| A-M24 | N/A | N/A | Does not require repair | **B-M24** | TBD | TBD | Unobserved / Unknown |
| A-M25 | N/A | N/A | Does not require repair | **B-M25** | TBD | TBD | Unobserved / Unknown |
| A-M26 | N/A | N/A | Does not require repair | **B-M26** | TBD | TBD | Unobserved / Unknown |
| A-S8 | N/A | N/A | Does not require repair | B-S8 | N/A | N/A | Does not require repair |
| A-S9 | N/A | N/A | Does not require repair | B-S9 | N/A | N/A | Does not require repair |
| A-S10 | N/A | N/A | Does not require repair | B-S10 | N/A | N/A | Does not require repair |
| A-S11 | N/A | N/A | Does not require repair | B-S11 | N/A | N/A | Does not require repair |
| A-S12 | N/A | N/A | Does not require repair | B-S12 | N/A | N/A | Does not require repair |

| Column | Resp. Party | Repair Type | Comments |
|---|---|---|---|
| C-N1 | N/A | N/A | Rebuilt in 2019/2020 |
| C-N2 | N/A | N/A | Rebuilt in 2019/2020 |
| C-N3 | N/A | N/A | Rebuilt in 2019/2020 |
| C-N4 | N/A | N/A | Rebuilt in 2019/2020 |
| C-N5 | N/A | N/A | Rebuilt in 2019/2020 |
| C-N6 | N/A | N/A | Rebuilt in 2019/2020 |
| C-N7 | N/A | N/A | Rebuilt in 2019/2020 |
| C-M1 | N/A | N/A | Does not require repair |
| C-M2 | N/A | N/A | Does not require repair |
| C-M3 | N/A | N/A | Does not require repair |
| C-M4 | N/A | N/A | Does not require repair |
| C-M5 | N/A | N/A | Does not require repair |
| C-M6 | N/A | N/A | Does not require repair |
| C-M7 | N/A | N/A | Does not require repair |
| **C-M8** | TBD | TBD | Unobserved / Unknown |
| C-M9 | N/A | N/A | Does not require repair |
| C-M10 | N/A | N/A | Does not require repair |
| C-M11 | N/A | N/A | Does not require repair |
| C-M12 | N/A | N/A | Does not require repair |
| C-M13 | N/A | N/A | Does not require repair |
| C-M14 | N/A | N/A | Does not require repair |
| C-M15 | N/A | N/A | Does not require repair |
| **C-M16** | TBD | TBD | Unobserved / Unknown |
| **C-M17** | TBD | TBD | Unobserved / Unknown |
| **C-M18** | TBD | TBD | Unobserved / Unknown |
| **C-M19** | TBD | TBD | Unobserved / Unknown |
| **C-M20** | TBD | TBD | Unobserved / Unknown |
| **C-M21** | TBD | TBD | Unobserved / Unknown |
| **C-M22** | TBD | TBD | Unobserved / Unknown |
| **C-M23** | TBD | TBD | Unobserved / Unknown |
| **C-M24** | TBD | TBD | Unobserved / Unknown |
| **C-M25** | TBD | TBD | Unobserved / Unknown |
| **C-M26** | TBD | TBD | Unobserved / Unknown |
| **C-S8** | NC Ports | Replace all, like kind | Needs Repair |
| **C-S9** | NC Ports | Replace all, like kind | Needs Repair |
| **C-S10** | NC Ports | Replace all, like kind | Needs Repair |
| **C-S11** | NC Ports | Replace all, like kind | Needs Repair |
| C-S12 | N/A | N/A | Does not require repair |

| Column | Resp. Party | Repair Type | Comments |
|---|---|---|---|
| D-N1 | N/A | N/A | Rebuilt in 2019/2020 |
| D-N2 | N/A | N/A | Rebuilt in 2019/2020 |
| D-N3 | N/A | N/A | Rebuilt in 2019/2020 |
| D-N4 | N/A | N/A | Rebuilt in 2019/2020 |
| D-N5 | N/A | N/A | Rebuilt in 2019/2020 |
| D-N6 | N/A | N/A | Rebuilt in 2019/2020 |
| D-N7 | N/A | N/A | Rebuilt in 2019/2020 |
| D-M1 | N/A | N/A | Does not require repair |
| **D-M2** | SEC | TBD | Needs Repair |
| **D-M3** | SEC | TBD | Needs Repair |
| **D-M4** | TBD | TBD | Unobserved / Unknown |
| **D-M5** | TBD | TBD | Unobserved / Unknown |
| **D-M6** | TBD | TBD | Unobserved / Unknown |
| **D-M7** | TBD | TBD | Unobserved / Unknown |
| **D-M8** | TBD | TBD | Unobserved / Unknown |
| **D-M9** | TBD | TBD | Unobserved / Unknown |
| **D-M10** | TBD | TBD | Unobserved / Unknown |
| **D-M11** | TBD | TBD | Unobserved / Unknown |
| D-M12 | N/A | N/A | Does not require repair |
| D-M13 | N/A | N/A | Does not require repair |
| D-M14 | N/A | N/A | Does not require repair |
| D-M15 | N/A | N/A | Does not require repair |
| D-M16 | N/A | N/A | Does not require repair |
| D-M17 | N/A | N/A | Does not require repair |
| D-M18 | N/A | N/A | Does not require repair |
| **D-M19** | SEC | TBD | Needs Repair |
| D-M20 | N/A | N/A | Does not require repair |
| **D-M21** | TBD | TBD | Unobserved / Unknown |
| D-M22 | N/A | N/A | Does not require repair |
| D-M23 | N/A | N/A | Does not require repair |
| **D-M24** | TBD | TBD | Unobserved / Unknown |
| D-M25 | N/A | N/A | Does not require repair |
| D-M26 | N/A | N/A | Does not require repair |
| **D-S8** | NC Ports | Replace all, like kind | Needs Repair |
| **D-S9** | NC Ports | Replace all, like kind | Needs Repair |
| **D-S10** | NC Ports | Replace all, like kind | Needs Repair |
| **D-S11** | NC Ports | Replace all, like kind | Needs Repair |
| D-S12 | N/A | N/A | Does not require repair |

| Column | Resp. Party | Repair Type | Comments | Column | Resp. Party | Repair Type | Comments |
|---|---|---|---|---|---|---|---|
| E-N1 | N/A | N/A | Rebuilt in 2019/2020 | F-N1 | N/A | N/A | Rebuilt in 2019/2020 |
| E-N2 | N/A | N/A | Rebuilt in 2019/2020 | F-N2 | N/A | N/A | Rebuilt in 2019/2020 |
| E-N3 | N/A | N/A | Rebuilt in 2019/2020 | F-N3 | N/A | N/A | Rebuilt in 2019/2020 |
| E-N4 | N/A | N/A | Rebuilt in 2019/2020 | F-N4 | N/A | N/A | Rebuilt in 2019/2020 |
| E-N5 | N/A | N/A | Rebuilt in 2019/2020 | F-N5 | N/A | N/A | Rebuilt in 2019/2020 |
| E-N6 | N/A | N/A | Rebuilt in 2019/2020 | F-N6 | N/A | N/A | Rebuilt in 2019/2020 |
| E-N7 | N/A | N/A | Rebuilt in 2019/2020 | F-N7 | N/A | N/A | Rebuilt in 2019/2020 |
| E-M1 | N/A | N/A | Does not require repair | **F-M1** | SEC | TBD | Needs Repair |
| **E-M2** | SEC | TBD | Needs Repair | F-M2 | N/A | N/A | Does not require repair |
| **E-M3** | SEC | TBD | Needs Repair | F-M3 | N/A | N/A | Does not require repair |
| E-M4 | N/A | N/A | Does not require repair | F-M4 | N/A | N/A | Does not require repair |
| E-M5 | N/A | N/A | Does not require repair | **F-M5** | SEC | TBD | Needs Repair |
| E-M6 | N/A | N/A | Does not require repair | **F-M6** | SEC | TBD | Needs Repair |
| **E-M7** | SEC | TBD | Needs Repair | F-M7 | N/A | N/A | Does not require repair |
| E-M8 | N/A | N/A | Does not require repair | F-M8 | N/A | N/A | Does not require repair |
| E-M9 | N/A | N/A | Does not require repair | F-M9 | N/A | N/A | Does not require repair |
| E-M10 | N/A | N/A | Does not require repair | **F-M10** | SEC | TBD | *Repaired by NC Ports |
| **E-M11** | SEC | TBD | Needs Repair | **F-M11** | SEC | TBD | *Repaired by NC Ports |
| **E-M12** | SEC | TBD | Needs Repair | **F-M12** | SEC | TBD | *Repaired by NC Ports |
| E-M13 | N/A | N/A | Does not require repair | F-M13 | N/A | N/A | Does not require repair |
| E-M14 | N/A | N/A | Does not require repair | F-M14 | N/A | N/A | Does not require repair |
| **E-M15** | SEC | TBD | Needs Repair | F-M15 | N/A | N/A | Does not require repair |
| **E-M16** | SEC | TBD | Needs Repair | F-M16 | N/A | N/A | Does not require repair |
| E-M17 | N/A | N/A | Does not require repair | F-M17 | N/A | N/A | Does not require repair |
| E-M18 | N/A | N/A | Does not require repair | F-M18 | N/A | N/A | Does not require repair |
| E-M19 | N/A | N/A | Does not require repair | F-M19 | N/A | N/A | Does not require repair |
| E-M20 | N/A | N/A | Does not require repair | F-M20 | N/A | N/A | Does not require repair |
| E-M21 | N/A | N/A | Does not require repair | F-M21 | N/A | N/A | Does not require repair |
| E-M22 | N/A | N/A | Does not require repair | F-M22 | N/A | N/A | Does not require repair |
| **E-M23** | TBD | TBD | Unobserved / Unknown | **F-M23** | TBD | TBD | Unobserved / Unknown |
| **E-M24** | TBD | TBD | Unobserved / Unknown | **F-M24** | TBD | TBD | Unobserved / Unknown |
| **E-M25** | TBD | TBD | Unobserved / Unknown | **F-M25** | TBD | TBD | Unobserved / Unknown |
| **E-M26** | TBD | TBD | Unobserved / Unknown | F-M26 | N/A | N/A | Does not require repair |
| E-S8 | N/A | N/A | Does not require repair | F-S8 | N/A | N/A | Does not require repair |
| E-S9 | N/A | N/A | Does not require repair | F-S9 | N/A | N/A | Does not require repair |
| E-S10 | N/A | N/A | Does not require repair | F-S10 | N/A | N/A | Does not require repair |
| E-S11 | N/A | N/A | Does not require repair | F-S11 | N/A | N/A | Does not require repair |
| E-S12 | N/A | N/A | Does not require repair | F-S12 | N/A | N/A | Does not require repair |